A00A1502. WILLIS et al. v. FIRST DATA POS, INC.
(536 SE2d 198)

ELDRIDGE, Judge.

Joe Willis, Dan Gordon, Jim Javors, and Daniel Johnston ("the Willis group") sued First Data Pos, Inc. for misrepresentation, breach of contract, and violation of the Georgia Racketeer Influenced & Corrupt Organizations Act, arising from the purchase of their stock in the software development company, COIN Banking Systems, Inc. On April 23, 1999, the trial court granted summary judgment on all theories of liability. We find under each theory of civil fraud and breach of contract that the trial court properly granted summary judgment because of the language of the Stock Purchase Agreement. However, there exists a material issue of fact as to RICO, because there is no defense of justifiable reliance or of "merger" in criminal fraud. Accordingly, as to the RICO claim, we reverse.

In 1991, First Data approached the owners of Retail Interact, a California developer of software, and persuaded its stockholders to sell out this prosperous company with current year profits and sales on the books that required future performance; the inducement for sale of their stock was upfront cash, employment for several years, and an additional contingent consideration over three years based upon increased sales by Retail Interact. Promises of combined product sales and investing resources in Retail Interact to enhance the company's products and substantially increase sales were orally made but were carefully excluded from the Stock Purchase Agreement.

However, once First Data owned Retail Interact, all of the 1991 sales revenue by Retail Interact was shown as profit in that year by accrual accounting, instead of part performance accounting. Also, future expenses of performance of such sales were not accrued. Such deceptive accounting practices created inaccurate profits on the

books and artificially inflated First Data's profits as the parent company.

Such future costs as they were incurred would have forced a loss in 1992 on the books of First Data, unless it could show a substantial increase of profits from some other source than Retail Interact to offset such expenses, because to grow Retail Interact's revenue would trigger the additional consideration being owed to the former stockholders under the Stock Purchase Agreement.

COIN showed an annual rate of revenue increase of 40 percent between 1989 and 1992 and was a prime target for First Data's buyout of stock to provide profits in 1992. In the November-December 1992 period alone, COIN had actual sales of over $4,000,000, and prior to the stock sale, it projected sales for this period at $2,000,000. First Data orally promised the Willis group the investment of resources and personnel into COIN to make it grow; First Data paid cash up front for the stock, promised jobs for three years, and agreed to pay additional consideration contingent on COIN attaining certain revenue levels in the last two months of 1992 and the next three years, as it had with Retail Interact.

On October 30, 1992, First Data purchased the stock of the Willis group through the use of an artfully crafted Stock Purchase Agreement that had the illusion of the oral promises of resource contribution; however, in the agreement, First Data reserved the power to terminate COIN's operations without committing to invest any additional assets or personnel, which legally negated such oral promises and would protect it from any civil fraud or breach of contract actions. The Stock Purchase Agreement also contained a merger agreement that legally negated all prior commitments of resources.

As soon as First Data gained control of COIN, it changed the method of accounting to show on its and COIN's books the 1992 sales as substantial profits in 1992 by accruing the revenue from sales, but not the expense for performance of the 1992 sales and not allocating future expenses, necessary expenses, and costs for personnel to perform these 1992 software sales. It also kept costs in 1993 at a bare minimum. The inability of COIN to perform the 1992 sales of service in installing the software and a delay in installation in 1993 had a chilling effect on future sales by COIN, so that the contingency for additional compensation could not occur as in the situation with Retail Interact. To prevent a loss, First Data kept the costs below the contract performance levels. *Held*:

1. Plaintiffs' first enumeration of error is that the trial court erred in granting summary judgment on their tort fraud action. We find that the express terms of the Stock Purchase Agreement were intentionally crafted by First Data to protect it from tort fraud liability. This agreement was crafted with a merger clause and in such

contract terms that a reasonable, prudent person exercising due diligence for their own protection in reading the contract should have known that any promises of resource allocation to COIN made by First Data orally were a mere illusion; that First Data possessed at all times the power to pull the plug on COIN; and that there could be no reasonable reliance on the false representations prior to execution and made to induce the stock sale, because such were refuted by the contract itself. See *Estate of Farkas v. Clark*, 238 Ga. App. 115, 119 (1) (517 SE2d 826) (1999); *Kaye v. Ryland Group*, 228 Ga. App. 742, 743 (492 SE2d 729) (1997).

From the record it is clear that First Data in its oral representations made in person and by telephone, and representations by mail to the Willis group promised to make substantial contributions to the development of COIN to induce the Willis group to sell their stock at below market value for cash and contingent consideration. However, the merger clause in the Stock Purchase Agreement negated such fraud in the inducement. *Estate of Farkas v. Clark*, supra at 117-118; see also *Kaye v. Ryland Group*, supra at 743. Therefore, in tort fraud, the Willis group had no cause of action. *Willis v. Brooks & Thomas Motor Co.*, 101 Ga. App. 248 (113 SE2d 403) (1960).

Although the contract had some terms that gave the illusion of a commitment to make the necessary, reasonable, and promised resources available to COIN, i.e., the Covenant Not to Compete, First Data retained the express power under the clear terms of the contract to starve COIN of resources and to pull the plug on COIN if it wished. Thus, the Willis group failed to exercise ordinary care for its own protection as a matter of tort fraud by entering into a contract that expressly gave First Data the right, discretion, and power to do the opposite of what it orally promised to do. Thus, no reasonable reliance could exist as a matter of civil law. See *Boynton v. State Farm &c. Ins. Co.*, 207 Ga. App. 756, 757 (429 SE2d 304) (1993).

2. Plaintiffs contend that the trial court erred in finding no breach of contract or breach of duty of good faith and fair dealing in granting the summary judgment. We do not agree. Again, First Data carefully crafted the Stock Purchase Agreement to protect itself from this very action by the wording of the agreement. There was neither a breach of contract nor a breach of duty of good faith and fair dealing, because the agreement expressly denied such duties. The agreement had no provision that was enforceable regarding specific levels of resources, personnel, or investment in COIN by First Data that would affect the additional consideration and gave full power and discretion to First Data to make such decisions. In fact, although the Willis group were employees for three years, they had no control or authority to hire more personnel or make investments in COIN to perform the 1992 sales or any future sales of software.

First Data, under the terms of the agreement, had no duty of good faith and fair dealing regarding the contingent consideration, and no implied duty of reasonable diligence arose from this contract, because such duty would conflict with the express term of the agreement, negating such duties. The Willis group conveyed all of its ownership interests. The Willis group received some, although inadequate, fixed consideration. There existed a need for First Data to exercise discretion, and therefore, no implied duty of fair dealing arose. See *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 151 (1) (304 SE2d 365) (1983); *Palmer Brick Co. v. Woodward*, 138 Ga. 289, 299 (3) (d), (e) (75 SE 480) (1912); *DPLM, Ltd. v. J. H. Harvey Co.*, 241 Ga. App. 219, 224-225 (2) (526 SE2d 409) (1999); *Hodges v. Ga. Kaolin Co.*, 108 Ga. App. 115, 118 (1) (132 SE2d 86) (1963).

First Data, in writing the contract, expressed a clear intent that it would have no express or implied duty to contribute to the resources of COIN or to hire necessary personnel. Thus, the express terms of the contract negated First Data's duty under Georgia law of good faith and fair dealing. *West v. Koufman*, 259 Ga. 505, 506 (384 SE2d 664) (1989); *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. 772, 774 (1) (364 SE2d 556) (1988). Any pre-agreement promises as to resources vanished and were eliminated by the merger provision when the Stock Purchase Agreement was executed by all parties.

3. Plaintiffs contend that the trial court erred in granting summary judgment on their RICO claim. We agree and reverse.

(a)

Theft by deception and civil fraud have different elements and are not necessarily proved by the same evidence. See *Robinson v. State*, 198 Ga. App. 431, 433 (401 SE2d 621) (1991). Theft by deception is committed when a person "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." OCGA § 16-8-3 (a).

*Avery v. Chrysler Motors Corp.*, 214 Ga. App. 602, 603 (1) (448 SE2d 737) (1994). Thus, for purposes of RICO, the absence of civil fraud does not mean also the absence of criminal fraud, i.e., theft by deception. Id.

[A] conviction under OCGA § 16-8-3 (b) (1) is authorized only when there is a deceitful misrepresentation regarding "an existing fact or past event," and a false promise of future performance cannot be the basis for a conviction. *Croy v. State*, 133 Ga. App. 244, 246 (1) (211 SE2d 183) (1974). The

reason for the rule regarding existing or past events is that if the party to whom the representation was made chose to rely upon the promise as to a future contingency, he is not deceived by deceitful means or artful practice, but his loss results from his absolute confidence in the party making the promise. Id. at 247-248.

(Punctuation and emphasis omitted.) *Robinson v. State*, supra at 433. However, under OCGA § 16-8-3 (b) (5), when the defendant "[p]romises performance of services which he does not intend to perform or knows will not be performed," such constitutes theft by deception. Theft by deception requires that the person committing the crime knows or believes that the created impression (which itself must have been intentionally created or confirmed) is false. OCGA § 16-8-3 (b); *Avery v. Chrysler Motors Corp.*, supra at 604. In this case, the merger clause negated any and all promises of resource contribution as soon as the agreement was executed, which was the apparent intent of First Data from the drafting of the agreement.

It has uniformly been held that the offense therein declared was not for failure to perform services or pay debts, but was for fraudulently procuring money or other thing of value; that the fraudulent conduct of the defendant was the gist of the crime, not merely his failure to perform his contract.

(Citations and punctuation omitted.) *Bullard v. State*, 60 Ga. App. 33, 34 (4) (2 SE2d 725) (1939). Here, such knowledge and intent can reasonably be inferred from the earlier treatment of Retail Interact and from the crafting of the Stock Purchase Agreement to negate any promises of future contribution of capital upon the execution of the contract with its merger clause, which promises induced COIN to execute the contract in the first place. The jury must decide whether First Data's commitment of resources was a statement of present fact made prior to the execution of the Stock Purchase Agreement to induce the sale or whether such was a future promise, which ceased upon the execution of the agreement for purposes of OCGA § 16-8-3 (b) (1) by the merger clause. Likewise, the jury must decide whether the promise of resources in the future under the oral promises and the written agreement was for part performance of services under OCGA § 16-8-3 (b) (5). See *Cross v. State*, 126 Ga. App. 346, 349 (1) (190 SE2d 561) (1972). In this case, the carefully crafted illusion of contract terms requiring good faith, fair dealing, and commitment of resources — when coupled with the express provisions of the merger clause and the discretion to terminate COIN thereby negating all prior commitments and assertions of good faith and fair dealing —

allows a reasonable inference of intent to be drawn by the trier of fact. This legal sleight of hand gives rise to the reasonable inference of the knowledge, intent, and design not to perform the oral promises that induced the sale at below market value and to deceive, since First Data drafted this agreement.

(b) The elements of wire and mail fraud are: (1) the defendant either directly or as an accessory must have a scheme or artifice to defraud; (2) the defendant, or an associate within the scheme, used the wire or mail or caused the wire or mail to be used; and (3) the purpose of using the wire or mail was to execute the scheme or furtherance of the scheme, including delay in detection of the fraud. *Simpson Consulting v. Barclays Bank*, 227 Ga. App. 648, 653 (490 SE2d 184) (1997) (physical precedent only). For purposes of 18 USC §§ 1341 and 1343, the difficulty of proving specific intent to commit mail fraud or wire fraud has caused the "liberal policy as to the admission of evidence tending to prove good or bad faith." (Citation and punctuation omitted.) *United States v. Foshee*, 606 F2d 111, 112-113 (5th Cir. 1979).

Under the Georgia RICO Act, the defendant must commit two predicate acts constituting a "pattern of racketeering activity" in a criminal enterprise which, on the evidence before this Court, a jury may find that First Data committed criminal fraud. OCGA §§ 16-14-3 (6), (8), (9); 16-14-4 (a); 16-14-6 (c); *Dee v. Sweet*, 268 Ga. 346, 349 (1) (489 SE2d 823) (1997); *Gentry v. Volkswagen of America*, 238 Ga. App. 785, 790 (521 SE2d 13) (1999); *Adams v. State*, 231 Ga. App. 279, 282 (2) (499 SE2d 105) (1998). Under OCGA § 16-14-3, plaintiffs presented some evidence to create a material issue of fact as to whether First Data engaged in the same predicate acts of criminal fraud, i.e., theft by deception, that has no defense of exercise of reasonable care to avoid fraud or contract merger clause. Predicate acts are shown under the Georgia RICO statute, OCGA § 16-14-3 (9) (A) "Racketeering activity," subsection (x) "theft by deception" under OCGA § 16-8-3 (b) (1) (5), and subsection (xxix) referring to the Federal RICO Act, 18 USC § 1961 (1) (B) by use of "mail or wire fraud,"[1]

---

[1] 18 USC § 1341:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes

in furtherance of an unlawful scheme to defraud so as to constitute "wire fraud" and "mail fraud." These are predicate acts that arise from the same facts and circumstances from the record in this case and may be found by a jury to constitute a pattern of racketeering activity as part of a criminal enterprise.

Plaintiffs presented some evidence to raise a material issue of fact as to the existence of a pattern of racketeering activity within the meaning of OCGA § 16-14-3 (8) when they showed the similarity of the Stock Purchase Agreements between First Data and Retail Interact and First Data and COIN; the accounting methods used to distort profits by not reflecting future costs; the pre-contract promises and inducements made orally in person and by telephone and by fax, e-mail, and letter to induce the contract; the contract designed to avoid the duty of good faith, fair dealing, and financial contribution to the growth of COIN and of Retail Interact and to avoid civil liability; the capital starvation of COIN and of Retail Interact through use of mail, e-mail, fax, and telephone to further the fraudulent scheme of avoiding contingent consideration; and the acquisition of COIN and Retail Interact at below their fair market value for fixed consideration, but preventing additional contingent consideration which could never be realized. Such evidence raises a factual issue for the jury as to the interconnectedness of such predicate acts as part of a common scheme or plan. See *Hedquist v. Merrill Lynch &c.*, 236 Ga. App. 181, 183 (1) (511 SE2d 558) (1999); *Larson v. Smith*, 194 Ga. App. 698, 699 (391 SE2d 686) (1990); *Dover v. State*, 192 Ga. App. 429, 431 (1) (385 SE2d 417) (1989).

A jury could find that the plaintiffs were the target of predicate acts of criminal fraud, which were part of a pattern of racketeering activity including Retail Interact, and which directly caused pecuniary loss to flow from the predicate acts by preventing the contingent compensation from occurring. *Gentry v. Volkswagen of America,*

---

to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

18 USC § 1343:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

What constitutes fraud is determined by other statutes. *Parr v. United States*, 363 U. S. 370 (80 SC 1171, 4 LE2d 1277) (1960). 18 USC § 1341 applies to schemes to defraud regardless of whether it is forbidden by state law. *United States v. States*, 488 F2d 761 (8th Cir. 1973); *United States v. Bush*, 522 F2d 641 (7th Cir. 1975); *United States v. Foshee*, supra at 113.

supra at 791 (4).

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Barnes, J., concur.*

DECIDED JUNE 21, 2000 —
RECONSIDERATION DENIED JULY 14, 2000

*King & Croft, F. Carlton King, Jr., Arnold J. Wolf,* for appellants.
*Sutherland, Asbill & Brennan, Thomas A. Cox, Kristen J. Indermark,* for appellee.