A02A0355. ELLERBEE v. THE STATE.
(569 SE2d 902)

SMITH, Presiding Judge.

Clarence Ellerbee was tried for four counts of deposit account fraud and one count of theft by deception. He was convicted solely of the crime of theft by deception. Following the denial of his motion for new trial, Ellerbee filed this appeal in which he contests the sufficiency of the evidence. He also contends that his acquittal on the other charges necessitated his acquittal on the theft by deception charge. Because we find that the record lacks proof of all the essential elements of the crime of theft by deception, we reverse.

Construed to support the verdict, the evidence shows that after working in retail automotive sales for more than 25 years, in October 1997, Ellerbee began a used car business known as Ellerbee Auto Sales. One of the primary suppliers of vehicles for Ellerbee's used car

---

[1] *Dyer v. Spectrum Engineering*, 245 Ga. App. 30, 33 (2) (537 SE2d 175) (2000).
[2] *King v. Bd. of Regents &c. of Ga.*, 238 Ga. App. 4, 5 (3) (516 SE2d 581) (1999).

business was Bill Heard Chevrolet[1] (Bill Heard or BHC). Between October 1997 and December 1999, Ellerbee purchased vehicles worth approximately $1,500,000 from Bill Heard for resale. On a regular basis, Ellerbee would submit bids on vehicles received by Bill Heard as trade-ins. If Bill Heard accepted the bid, Ellerbee would give Bill Heard a draft for the car and then recondition the car for resale on his own lot. The draft could be presented to a bank for payment only when combined with the vehicle title and other documents. By custom, the drafts were not presented for payment. Instead, when Bill Heard completed the title documents for a vehicle, which could require several weeks, Ellerbee would pick up the title work, retrieve his draft, and then pay Bill Heard by check. In this same manner, Ellerbee routinely would buy several cars at a time from Bill Heard. For more than two years, Ellerbee paid the dealership without any problems.

In the latter part of 1999, Ellerbee's used car business began experiencing cash flow problems due to sluggish sales and tax deficiencies. In December 1999 and January 2000, three checks allegedly written by Ellerbee[2] on the business checking account and made payable to Bill Heard or BHC failed to clear the bank. These were: check no. 2024, dated December 22, for $23,500; check no. 2099, dated January 14, for $23,350; and check no. 2119, dated January 21, for $28,300.

During the relevant period, Angela Myers was the employee at Bill Heard responsible for collecting checks and performing the tag and title work for wholesale deals. Myers explained that the first check that failed to clear the bank was deposited too soon as a result of a mistake on her part.[3] Myers testified that "[w]e had [a] verbal agreement that — when I trained for the position, the girl before me said that she — it was agreed that they held Bunky's [Ellerbee's nickname] checks for two to three days." Myers testified that when she told Sparky Allen, her direct supervisor, about her error in failing to hold the check for a few days, he told her not to worry about it. Myers testified that Allen knew about the agreement with Ellerbee to delay cashing his checks and to hold them for a short period, usually a few days. Myers testified that the arrangement to hold Ellerbee's checks had been in place when she started work at Bill Heard, and she testified that "pretty much on a weekly basis" Ellerbee's checks were held for later deposit. According to Myers, the January 14 check was held

---

[1] The checks from Ellerbee's two business accounts varied in designating the payee as Bill Heard Chevrolet, Bill Heard, BHC, Bill Heard Olds, or Bill Heard Oldsmobile.

[2] Check no. 2024 made payable to BHC for $23,500 and dated December 22, was not signed by Ellerbee but instead bears the signature of Amber Ellerbee.

[3] On December 10, Bill Heard accepted check no. 2000 for $23,500, but on December 13, Ellerbee replaced it with check no. 2024.

and not deposited until January 20.

The general manager at Bill Heard, Steve Kash, testified that Ellerbee had "a long-term relationship with Bill Heard Company" and had "bought a lot of vehicles from us." Kash confirmed that Ellerbee had "two years of history of him holding good to all of his money" and that Bill Heard had never previously had "a bounced check from Mr. Ellerbee." Kash confirmed that on December 22, Ellerbee had brought check no. 2024 to the dealership. Kash admitted the check was held for about two weeks and testified, "We deposited the check on January the 4th." Kash testified that when the second check came, "I didn't know about the first check, that it wasn't going to be sufficient funds, until I'd already taken the second check." But, when the third check was accepted, Kash admitted that he knew "I had two bad checks" and so "I didn't deposit it immediately because we had some verbal commitments that it would be made good." The dealership held the third check, no. 2119 dated January 21, until March 7. Kash denied the existence of a company policy to hold checks for wholesalers and testified that he did not agree to hold any of these checks before depositing them. Kash testified that after the first bad check, Ellerbee had said, "I'm going to bring you in 10,000 within a week or so; and I'll bring you in some more money by the end of the month." In response, Kash had said, "Well, bring it down here and let's get this thing cleared up quickly." According to Kash's testimony, Ellerbee said that "by the end of the month, I'll bring you, you know, the balance of that check or whatever," but he did not do so. According to Kash, "and that was the extent of our agreement, if any was there, to bring in the money for the checks." At some point, Kash realized that despite Ellerbee's reassurances, the checks would not be made good, and "the commitments were not going to come to fruition." Kash was asked, "Do you oversee all of the operations at Bill Heard?" Kash responded, "I certainly do, but I'm certainly not aware of all of the billing procedures."

None of the vehicles was returned to the dealership, primarily because Ellerbee was "floor planning" the vehicles on his used car sales lot. Floor planning is the practice of pledging the titles of vehicles that are held out for sale on a used car lot to banks and finance companies to obtain cash and operating money before the cars are actually sold to buyers. Ellerbee explained that it was not unusual for retail dealers like him to use money from current sales to pay for the cars previously purchased from wholesalers. According to Ellerbee, when the money came in, he paid off the cars that he had bought, "whether it be floor plan companies or Bill Heard or whoever." Ellerbee testified that he tried to pay Bill Heard for the cars but could not do so and tried to arrange a payment plan. According to Ellerbee, "In January [2000] I pulled my retirement, my 401 of

78,000 dollars and put it into my business." Despite the infusion of all of the funds in his individual retirement accounts into the business, by April 2000, Ellerbee had lost $250,000 and was forced to close his doors.

The trial court directed a verdict on Count 1 since that check had been replaced by another check. Although the jury acquitted Ellerbee of the remaining three counts of deposit account fraud, it convicted Ellerbee of theft by deception.

1. Ellerbee contends that the guilty verdict was not supported by the evidence. He asserts that the State failed to prove all the essential elements of the crime of theft by deception. He claims that he did not intend to write bad checks but simply lacked the ability to fund them when the checks were presented to the bank for payment.

The offense of theft by deception requires: (1) obtaining property by any deceitful means or artful practice; (2) with the intention of depriving the owner of the property. OCGA § 16-8-3 (a). The indictment charged Ellerbee with committing theft by deception in that

> between the 10th of December and the 7th of March, the defendant obtained property of Bill Heard Chevrolet, to wit: automobiles, by deceitful means or artful practice and with the intention of depriving said owner of said property, to wit: the defendant created another's impression of an existing fact which was false and said accused knew was false, to wit: the defendant paid for said automobiles with checks and implied that said checks were valid, but he knew that they would not be honored by the drawee bank. . . .

The gravamen of theft by deception "lies in obtaining the property of another by intentionally creating a false impression as to an existing fact or past event. Creating a false impression as to a future event, particularly, in this case, by a promise of future payment, is not sufficient." *Mathis v. State*, 161 Ga. App. 251 (288 SE2d 317) (1982) (conviction reversed where defendant persuaded grocer to let her have groceries worth $47.86 upon her promise to pay for them the following Friday, a promise she failed to keep).

In *Harrell v. State*, 192 Ga. App. 876, 877 (2) (386 SE2d 676) (1989), this court determined that evidence showing the defendant had purchased a new car by writing a check on a nonexistent bank account was sufficient to sustain a conviction for theft by deception. In *Harrell*, the "bank draft" that Harrell submitted as payment for a vehicle was a complete fabrication. Therefore, when Harrell obtained the vehicle he did so by using deceitful means to intentionally deprive the owner of its property. Similarly, in *Ramey v. State*, 239 Ga. App. 620, 622 (1) (521 SE2d 663) (1999), this court found sufficient evidence of theft by deception when the defendant deceived an

unwary purchaser into purchasing a stolen 1966 Mustang by using a falsified bill of sale and by altering the vehicle identification number.

Here, the record lacks evidence of a scheme to defraud or deceitful means or artful practice used to deprive Bill Heard of its property at the time the checks were submitted. Compare *Harrell*, supra. Ellerbee had a two-year history of "holding good," on all of his checks while purchasing approximately $1,500,000 worth of vehicles from Bill Heard. Ellerbee testified that at the time he wrote the checks to Bill Heard it was his intention to pay for the vehicles. No evidence showed otherwise. How Ellerbee or Bill Heard could have foreseen that the sales volume of Ellerbee's used car business would plummet and that the December and January sales would not suffice to cover the expenditures incurred in December 1999 and January 2000 is not clear. Moreover, Kash admitted holding the third check for six weeks, to await the arrival of funds in the account. As Kash explained, "Well, the second check was right on the heels of the first check. The third check, it was apparent very quickly that the third check was not going to be any good because the first two were bad. So that's why I didn't deposit it right away."

The bank statements of Ellerbee Auto Sales, Inc. from December 1999 and January 2000 document the shortfall in revenue and show that other checks Ellerbee wrote to the dealership did, in fact, clear the bank. Defense Exhibits 7 and 8 show that Ellerbee Auto Sales continued to purchase vehicles during December 1999 and January 2000, not only from Bill Heard but from Atlanta Auto Auction and other wholesalers. These monthly statements indicate that during December 1999 and January 2000, the same time frame that the three checks payable to Bill Heard failed to clear the bank, Ellerbee had written seven other checks payable to Bill Heard Chevrolet, BHC, Bill Heard, Bill Heard Olds, and Bill Heard Oldsmobile that did, in fact, clear the bank and were honored in full.[4] These various checks to the dealership total more than $45,000.[5]

---

[4] The Regions Bank monthly closing statement issued on December 31, 1999, shows that check no. 1934 for $19,500 to Bill Heard Chevrolet, dated November 19, 1999, cleared on November 30, 1999; check no. 1972 to BHC for $10,250, dated December 2, 1999, cleared on December 7, 1999; check no. 1973 to BHC, dated December 2, 1999, for $14,600 cleared on December 14, 1999; and check no. 1999 for $4,600 to Bill Heard Olds, dated December 10, 1999, cleared on December 24, 1999. The Regions Bank monthly closing statement issued on January 31, 2000, shows that check no. 2056 for $14,500 to Bill Heard, dated December 29, 1999, cleared on January 11, 2000, and check no. 2089 for $1,200 to Bill Heard Oldsmobile, dated January 10, 2000, cleared on January 13, 2000.

[5] A bank closing statement from February 29, 2000, for a different business checking account of Ellerbee Auto Sales shows that check no. 1048 to Bill Heard Chevrolet for $4,500, dated January 21, 2000; check no. 1055, dated February 1, 2000, to Bill Heard Chevrolet for $9,350; and check no. 1060, dated February 4, 2000, to Bill Heard Chevrolet for $133.18 were all honored by the bank.

The jury acquitted Ellerbee of all charges of deposit account fraud, indicating that the jury did not believe the State proved that Ellerbee "delivered an instrument for the payment of money on a bank . . . for a present consideration, to wit: automobiles knowing that said check would not be honored by the drawee." The State has pointed to no evidence, and we have found none, that shows that Ellerbee used deceitful means or artful practice intentionally to defraud Bill Heard of its property at the time that he submitted the three checks to Bill Heard for the vehicles. Compare *Ludden v. State*, 176 Ga. App. 109 (335 SE2d 428) (1985) (defendant concocted scheme in which he paid for airline tickets with checks on closed accounts or with insufficient funds, then cancelled the flights and obtained refunds from the airline). No evidence shows that at the time Ellerbee wrote the checks to Bill Heard, the dealership was induced to part with its property since Ellerbee already had the vehicles and some of the titles when he submitted the checks to Bill Heard. Compare *Harrell*, supra.

Even if Ellerbee had repeatedly promised to make the checks good or to come into the dealership to pay part of the balance, and did not do so, a promise of future performance cannot serve as the basis of a theft by deception prosecution. *Croy v. State*, 133 Ga. App. 244, 247 (211 SE2d 183) (1974).

> The reason for the rule regarding existing or past events is that if the party to whom the representation was made chose to rely upon the promise as to a future contingency, he is not deceived by deceitful means or artful practice, but his loss results from his absolute confidence in the party making the promise.

(Citation and punctuation omitted.) *Robinson v. State*, 198 Ga. App. 431, 433 (401 SE2d 621) (1991). The element of a false representation must bear on an existing fact or past event and not future performance. *Elliott v. State*, 149 Ga. App. 579, 581 (254 SE2d 900) (1979). "A mere promise to pay the purchase price in the future is not criminally actionable." *Harris v. State*, 141 Ga. App. 213, 216 (3) (233 SE2d 21) (1977). For this reason, any promises, reassurances, or representations made by Ellerbee that he would make the checks good could not as a matter of law constitute theft by deception. See *Robinson*, supra (insufficient evidence of theft by deception because investors did not rely on any misrepresentation of an existing fact, as opposed to a prediction of future performance). In fact, the jury's conclusion that Ellerbee was not guilty of delivering a check "knowing that said check would not be honored" demonstrates the absence of

proof of this essential element. All the other elements of deposit account fraud were shown without dispute.

The State's reliance upon *Hammitt v. State*, 183 Ga. App. 382 (359 SE2d 4) (1987), is misplaced. In that case, unlike here, the defendants wrote three checks for $16,200 on an account in which only $200 had ever been deposited. In that case, the defendants had devised a scheme to obtain vehicles knowing full well that the checks could not possibly be honored and fully intending to defraud the owner of his property. But here, no scheme to defraud or deceitful means or artful practice was ever shown. Compare *Ludden*, supra (evidence proved scheme to purchase airplane tickets with checks on closed accounts, cancel the flights, and then obtain refunds); see *Arnold v. State*, 210 Ga. App. 843, 847 (437 SE2d 844) (1993) (defendant deliberately made false representations to investors as to his ownership of collateral to induce investments). On the contrary, as Ellerbee testified and as the bank statements confirm, Ellerbee continued to purchase and to sell cars not only from Bill Heard but also from other wholesalers in a futile effort to keep his used car business afloat. Ellerbee testified that he infused all of his retirement funds into the business in an attempt to keep it going.[6] Compare *Harrell*, supra at 876 (defendant created counterfeit document to purchase vehicle). Because the record contains no evidence that Ellerbee employed a scheme to defraud or used deceitful means or artful practice to deprive Bill Heard of its property, proof of every essential element of the offense of theft by deception is lacking. See *Mathis*, supra. Therefore, Ellerbee's conviction for theft by deception must be reversed.

2. In light of this holding, we need not address the remaining issue.

*Judgment reversed. Eldridge and Ellington, JJ., concur.*

DECIDED JULY 11, 2002 —
RECONSIDERATION DENIED JULY 31, 2002.

*Brace W. Luquire, William J. Mason*, for appellant.

*J. Gray Conger, District Attorney, Melvin E. Hyde, Jr., Robert B. Bickerstaff II, Assistant District Attorneys*, for appellee.

---

[6] The March 2000 bank statement shows two deposits from IRAs, a $55,000 deposit and a $7,000 deposit from IRAs. These deposits indicate that Ellerbee was still trying to inject money into the business in February 2000.