**Donald R. and Joyce D.
SCHROERLUCKE,
Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 09–772T.**

United States Court of Federal Claims.

Sept. 21, 2011.

Edward D. Fickess, Andreozzi Fickess LLP, Clarence, NY, for the plaintiffs. With him was Randall P. Andreozzi, Andreozzi Fickess LLP.

Benjamin C. King, Jr., Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, for the defendant. With him were Steven I. Frahm, Chief, Court of Federal Claims Section and John A. DiCicco, Principal Deputy Assistant Attorney General, Tax Division.

## OPINION

HORN, J.

### FINDINGS OF FACT

Plaintiffs, Donald and Joyce Schroerlucke, filed a complaint in the United States Court of Federal Claims alleging they were due a tax refund for unreimbursed losses for the 1997, 1998, 1999, and 2002 tax years. Plaintiffs are husband and wife who filed joint federal income tax returns during all years relevant to this action. In each of those years, the plaintiffs were residents of the State of Georgia. Plaintiff Donald Schroerlucke is a former employee of WorldCom, Inc. In 1989, Mr. Schroerlucke was employed as Vice President of Operations at Long Distance Discount Services, Inc., the predecessor corporation to WorldCom. Pursuant to stock option agreements with Long Distance Discount Services, Inc., and then with WorldCom, Mr. Schroerlucke accumulated employee stock option grants between July 1991 and January 1998.

Mr. Schroerlucke's employment with WorldCom ended on January 4, 1999, at which time his stock options became fully and immediately vested according to the terms of the stock option agreements. Also, according to the terms of the stock option agreements and an April 7, 1998 memorandum titled, "WorldCom Employee Stock Option Program," once his employment ended, Mr. Schroerlucke was required to immediately exercise all of his employee stock options. The April 7, 1998 memorandum stated in part: "Please note that under the WorldCom Inc. 1997 Stock Option Plan, all vested options *must* be exercised prior to termination with the Company." (emphasis in original). After a final stock option grant award on January 2, 1998, Mr. Schroerlucke had accumulated 172,492 WorldCom stock options. Mr. Schroerlucke exercised all of his existing stock options on February 12, 1999, at which time the market value of his 172,492 WorldCom shares was $13,702,333.25, based on the $79.4375 per share, February 12, 1999, closing price of WorldCom stock.[1] Shortly after exercising his options, Mr. Schroerlucke sold 75,374 shares of the WorldCom stock he had received through those options at $80.67 per share, for a total of $6,082,586.97. He used part of the proceeds of that sale to pay the exercise price to WorldCom of $1,834,856.47 and to pay withholding taxes totaling $4,228,847.50. The remaining 97,118 shares of WorldCom stock from the option exercise, worth $7,714,811.12 (based on the $79.4375 per share February 12, 1999 closing price of WorldCom stock), were deposited into Mr. Schroerlucke's brokerage account.

At all times after February 12, 1999, when the stock options were exercised, Mr. Schroerlucke retained full ownership and control over his remaining WorldCom stock holdings, and he had the right to sell, or not

---

1. Plaintiffs state that prior to this February 12, 1999 stock option exercise, Mr. Schroerlucke had exercised 36,000 shares in options from a July 8, 1991 grant "to put a down payment on his house and to purchase a vehicle for his son."

sell, all or part of his WorldCom stock, at any time, and at his discretion. As of February 28, 1999, the market value of Mr. Schroerlucke's remaining WorldCom stock had risen from $7,714,811.12 to $8,012,235.00, based on the $82.50 per share price on that date. Mr. Schroerlucke appears to have held onto the remaining shares of WorldCom stock until May of 2002, when he began selling. On May 1, 2002, Mr. Schroerlucke sold 80,000 WorldCom shares for $175,189.37, for which his tax basis was $4,302,498.70, resulting in a net loss of $4,127,309.33. On May 24, 2002, Mr. Schroerlucke sold 1,242 WorldCom shares for $2,093.35, for which his tax basis was $66,796.29, resulting in a net loss of $64,702.94. On September 12, 2002, Mr. Schroerlucke sold 47,516 [2] WorldCom shares for $6,124.39, for which his tax basis was $2,555,469.11, resulting in a net loss of $2,549,344.72. In total, a net long-term capital loss of $6,741,358 [3] was reported by Mr. and Mrs. Schroerlucke on their 2002 tax return.

Mr. Schroerlucke alleges that he was informed on a continuing basis that his stock was safe and would hold its value. For example, plaintiffs point out that Bernard Ebbers, then-Chief Executive Officer (CEO) of WorldCom, stated in a 1997 form letter to Mr. Schroerlucke that accompanied the award of stock options, "[t]he value of this reward increases as our stock performs successfully." Mr. Ebbers further stated, in an undated form letter to Mr. Schroerlucke, "our [WorldCom's] track record for creating shareholder value is unparalleled" and "WorldCom received a letter grade of A for stock market performance over the 10–year period ending December 31, 1997, placing us in the top 20% of the overall ranking." In an April 7, 1998 memorandum titled "WorldCom Employee Stock Option Program," the company indicated that employees who chose the "Exercise and Sell Balance" method would "give up future potential stock price appreciation." The memorandum indicated that employees also could choose to "Exercise and Hold" or "Exercise and Sell to Cover," and both methods would mean that the employee had "an investment in WorldCom's future."

Also, according to plaintiffs, "[j]ust prior" to Mr. Schroerlucke's exercise of his WorldCom stock options in February 1999, Mr. Schroerlucke spoke with Mr. Ebbers over the phone. During this call, Mr. Schroerlucke "asked Mr. Ebbers about his family and how the company was doing." Mr. Ebbers replied "everything was fine with the family and the company was doing well." Additionally, Mr. Schroerlucke indicates that during his employment at WorldCom, which ended on January 4, 1999, he had "numerous contacts with various top-level officials at WorldCom, including CEO Ebbers and CFO [Chief Financial Officer] Scott Sullivan." These contacts, according to Mr. Schroerlucke, were often "one-on-one meetings or meetings with other WorldCom officials, in both business and personal settings." According to Mr. Schroerlucke, "[d]uring all of these contacts, WorldCom and its officials or agents represented that WorldCom was an exceptional company and could be trusted to run its business in an ethical and honest fashion." Moreover, according to Mr. Schroerlucke, "[o]n numerous occasions, Mr. Ebbers personally and specifically discouraged Plaintiff from selling any WorldCom shares."

According to the criminal indictment of Mr. Ebbers, beginning in September 2000, then-CEO Ebbers and then-CFO Scott Sullivan "engaged in an illegal scheme to deceive

**2.** The total number of shares sold by Mr. Schroerlucke is higher than the number he was awarded because of a December 1999 stock split of WorldCom stock. The parties agree that as a result of the December 1999 stock split, Mr. Schroerlucke's holdings from exercising his WorldCom options increased to 145,677 shares of stock.

**3.** This dollar amount derives from plaintiffs' 2002 tax return and appears on the tax return as rounded to the nearest dollar. Plaintiffs' 2002 tax return states, for example, that the May 24, 2002 WorldCom stock sale was for $2,093, for which the tax basis was $66,796 and the loss, therefore, was $64,703. The actual dollar amounts referred to above ($2,093.35, $66,796.29, and 64,702.94, respectively), derive from Mr. Schroerlucke's UBS PaineWebber Resource Management Account 2002 Year–End Summary. Using these brokerage account values, the actual long term capital loss was $6,741,357.00.

members of the investing public, WorldCom shareholders, securities analysts, and the SEC, and others, concerning WorldCom's true operating performance and financial results." According to the criminal indictment, during this time, Mr. Ebbers and Mr. Sullivan presented a "materially false and misleading picture of WorldCom's operating performance and financial results" as part of a "scheme to deceive" and "inflate and maintain artificially the price of WorldCom common stock." On March 15, 2005, Mr. Ebbers was convicted of all nine counts for which he was indicted, including conspiracy to defraud the United States, and using manipulative and deceptive devices in connection with the purchase or sale of a security. On August 12, 2005, Mr. Sullivan pled guilty to a number of counts in his indictment, including conspiracy to defraud the United States, and using manipulative and deceptive devices in connection with the purchase or sale of a security.

According to the jointly stipulated facts submitted by the parties, the closing price of WorldCom stock sharply declined from March 2002 until June 24, 2002 when the closing price was $0.91 per share. On June 26, 2002, NASDAQ suspended trading of WorldCom stock until July 1, 2002. On July 21, 2002, WorldCom, and all of its subsidiaries, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. Mr. Schroerlucke, who had acquired all of his WorldCom stock on or before February 12, 1999, was not eligible to participate in the securities fraud class action lawsuit which was brought against WorldCom on April 30, 2002. Only those who had purchased WorldCom stock between April 29, 1999 and June 25, 2002 were eligible participants in the class action suit. *See In re WorldCom, Inc., ·Sec. Litig.,* 294 F.Supp.2d 392, 397 (S.D.N.Y.), *motion to certify appeal denied,* 2003 WL 22533398 (S.D.N.Y. Nov. 7, 2003).

On April 11, 2003, plaintiffs Donald and Joyce Schroerlucke filed their 2002 Form 1040 with the Internal Revenue Service (IRS), in which they claimed a capital loss of $6,741,348.00 as a result of the sale of 128,758 shares of WorldCom stock. Based on this capital loss, plaintiffs claimed and received the maximum, annual, capital loss deduction of $3,000.00, pursuant to 26 U.S.C. § 1211(b) (2006) on their 2002 return.[4] 26 U.S.C. § 1211(b).[5] On April 7, 2006, plaintiffs filed a 2002 Form 1040X, which amended their original capital loss claim to a theft loss claim under the provisions of 26 U.S.C. § 165 (2006), as a result of which plaintiffs claimed an additional refund of $9,959.00. Based on a carry back of their claimed theft loss in 2002, plaintiffs claimed additional refunds by filing amended tax returns for 1997, 1998, and 1999 on April 7, 2006 in the amounts of $63,018.00, $39,366.00, and $2,549,207.00, respectively. In total, plaintiffs' claims for refunds, based on alleged theft losses on their WorldCom stock, amounted to $2,661,550.00, resulting from unreimbursed theft losses of $6,530,047.53. The parties agree that plaintiffs' claims for refund were denied by the IRS on July 31, 2008.

Donald and Joyce Schroerlucke filed a complaint on November 10, 2009 in the United States Court of Federal Claims, followed by an amended complaint, and then by a second amended complaint. Plaintiffs allege that they were victims of theft by taking and theft by deception under Georgia state law with regard to Mr. Schroerlucke's WorldCom stock options. According to their second amended complaint, "Plaintiffs are allowed a net operating loss from 2002 which can be carried back five years to 1997 and then forward to 1998 and 1999, at which time the entire carry-back is fully utilized." As a result plaintiffs claim a tax refund of $2,661,550.00 for unreimbursed theft losses of $6,530,047.53. After filing its answer to plaintiffs' second amended complaint, the defendant filed a motion for summary judgment, alleging that there are no genuine disputes of material fact, and that defendant is entitled to judgment in its favor as a

---

4. If the net capital loss exceeds $3,000.00 in a taxable year, the excess can be carried back or carried forward into preceding or succeeding taxable years. *See* 26 U.S.C. § 1212(b) (2006).

5. The statute at 26 U.S.C. § 1211 has not been amended since 1986. Therefore, the court refers to the most current version.

matter of law because, based on the facts presented, there cannot be a theft under Georgia law.

## DISCUSSION

Plaintiffs seek a tax refund of $2,661,550.00. The United States Supreme Court has stated that: "A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims." *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) (citing both 28 U.S.C. § 1346(a)(1) and *EC Term of Years Trust v. United States*, 550 U.S. 429, 431, & n. 2, 127 S.Ct. 1763, 167 L.Ed.2d 729 (2007)); *see also Manor Care, Inc. v. United States*, 89 Fed.Cl. 618, 622 (2009) (citing *Flora v. United States*, 362 U.S. 145, 177, 80 S.Ct. 630, 4 L.Ed.2d 623, *reh'g denied*, 362 U.S. 972, 80 S.Ct. 953, 4 L.Ed.2d 902 (1960)); *Shore v. United States*, 9 F.3d 1524, 1527 (Fed.Cir.1993) and 28 U.S.C. § 1346(a), *aff'd*, 630 F.3d 1377 (Fed. Cir.2011); *Strategic Hous. Fin. Corp. v. United States*, 86 Fed.Cl. 518, 530 (citing *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. at 4, 128 S.Ct. 1511), *motion to amend denied*, 87 Fed.Cl. 183 (2009), *aff'd in part, vacated in part on other grounds*, 608 F.3d 1317 (Fed.Cir.2010), *cert. denied*, ⸺ U.S. ⸺, 131 S.Ct. 1513, 179 L.Ed.2d 308 (2011); *Buser v. United States*, 85 Fed.Cl. 248, 256 (2009) ("It is 'undisputed' that the Court of Federal Claims possesses the authority to adjudicate tax refund claims.") (citations omitted); *Radioshack Corp. v. United States*, 82 Fed.Cl. 155, 158 (2008) ("This Court has jurisdiction to consider tax refund suits under 28 U.S.C. § 1491(a)(1).") (citations omitted), *aff'd*, 566 F.3d 1358 (Fed.Cir. 2009).

Section 1346, cited by the United States Supreme Court in *Clintwood Elkhorn Mining Co.*, provides that:

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: (1) Any civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal revenue laws....

28 U.S.C. § 1346(a)(1) (2006).

For this court to exercise its jurisdiction over plaintiffs' federal tax refund claim, a petitioning party must first satisfy the tax refund schematic detailed in Title 26 of the Internal Revenue Code, which establishes that a claim for refund must be filed with the IRS before filing suit in federal court, and establishes strict deadlines for filing such claims. *See* 26 U.S.C. §§ 6511, 7422 (2006).[6] In *United States v. Clintwood Elkhorn Mining Co.*, the United States Supreme Court indicated that:

A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims. The Internal Revenue Code specifies that before doing so, the taxpayer must comply with the tax refund scheme established in the Code. That scheme provides that a claim for a refund must be filed with the Internal Revenue Service (IRS) before suit can be brought, and establishes strict timeframes for filing such a claim.

*United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. at 4, 128 S.Ct. 1511 (citations omitted); *see also Radioshack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed.Cir.2009) ("[I]n the context of tax refund suits, the

---

**6.** The statute at 26 U.S.C. § 7422(a) states:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been exces-

sive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a).

[Supreme] Court has held that the Court of Federal Claims's Tucker Act jurisdiction is limited by the Internal Revenue Code, including 26 U.S.C. § 7422(a)."); *United States v. Dalm,* 494 U.S. 596, 609–10, 110 S.Ct. 1361, 108 L.Ed.2d 548, *reh'g denied,* 495 U.S. 941, 110 S.Ct. 2195, 109 L.Ed.2d 523 (1990); *Buser v. United States,* 85 Fed.Cl. at 256. Moreover, for a refund claim, the court only may hear claims for which the petitioning taxpayer has fulfilled all of his or her tax liabilities for the tax year in question before the refund claim is heard. *Flora v. United States,* 357 U.S. 63, 72–73, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958) (*Flora I* ), *aff'd on reh'g,* 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (*Flora II* ), *reh'g denied,* 362 U.S. 972, 80 S.Ct. 953, 4 L.Ed.2d 902 (1960). In *Flora II,* the United States Supreme Court reiterated that 28 U.S.C. § 1346(a)(1) requires "payment of the full tax before suit. . . ." *Flora II,* 362 U.S. at 150–51, 80 S.Ct. 630; *see also Computervision Corp. v. United States,* 445 F.3d 1355, 1363 (Fed.Cir.), *reh'g and reh'g en banc denied,* 467 F.3d 1322 (Fed.Cir.2006), *cert. denied,* 549 U.S. 1338, 127 S.Ct. 2033, 167 L.Ed.2d 762 (2007); *Shore v. United States,* 9 F.3d at 1526 ("The full payment requirement of Section 1346(a)(1) and *Flora* applies equally to tax refund suits brought in the Court of Federal Claims . . . .") (citations omitted).

■ Essentially, section 7422(a) functions as a waiver of the government's sovereign immunity in tax refund suits. *Chicago Milwaukee Corp. v. United States,* 40 F.3d 373, 374 (Fed.Cir.1994), *reh'g and reh'g en banc denied,* 141 F.3d 1112 (Fed.Cir.), *cert. denied,* 525 U.S. 932, 119 S.Ct. 342, 142 L.Ed.2d 282 (1998); *see also Gluck v. United States,* 84 Fed.Cl. 609, 613 (2008). "[S]ection 7422(a) creates a jurisdictional prerequisite to filing a refund suit." *Id.* (citing *Chicago Milwaukee Corp. v. United States,* 40 F.3d at 374 (citing *Burlington N., Inc. v. United States,* 231 Ct.Cl. 222, 684 F.2d 866, 868 (1982))). Once a party has established compliance with 26 U.S.C. § 7422(a), the party may, if successful, also recover interest for its refund claim. *See Deutsche Bank AG v. United States,* 95 Fed.Cl. 423, 427 n. 3 (2010) (citing *Brown & Williamson, Ltd. v. United States,* 231 Ct.Cl. 413, 688 F.2d 747, 752

(1982)) ("There is no question, however, that this court has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2006), over claims, such as the present one, seeking to recover statutory interest on income tax refunds.").

■ Furthermore, as noted above, in order for a tax refund case to be duly filed in a federal court pursuant to section 7422(a), the filing must comply with the timing requirements set forth in 26 U.S.C. § 6511(a):

> The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied. When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.

*Block v. North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *see also Buser v. United States,* 85 Fed.Cl. at 257. The applicable language of section 6511(a) states:

> Claim for credit or refund of an overpayment of any tax imposed by this title . . . shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. . . .

26 U.S.C. § 6511(a); *see also* Treas. Reg. § 301.6511(a)–1 (2011) ("In the case of any tax . . .: If a return is filed, a claim for credit or refund of an overpayment must be filed by the taxpayer within 3 years from the time the return was filed or within 2 years from the time the tax was paid, whichever of such periods expires the later."). As articulated by the United States Supreme Court in *Commissioner v. Lundy,* 516 U.S. 235, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996):

A taxpayer seeking a refund of overpaid taxes ordinarily must file a timely claim for a refund with the IRS under 26 U.S.C. § 6511. That section contains two separate provisions for determining the timeliness of a refund claim. It first establishes a filing deadline: The taxpayer must file a claim for a refund "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." 26 U.S.C. § 6511(b)(1) (incorporating by reference 26 U.S.C. § 6511(a)). It also defines two "look-back" periods: If the claim is filed "within 3 years from the time the return was filed," ibid., then the taxpayer is entitled to a refund of "the portion of the tax paid within the 3 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(A) (incorporating by reference 26 U.S.C. § 6511(a)). If the claim is not filed within that 3–year period, then the taxpayer is entitled to a refund of only that "portion of the tax paid during the 2 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(B) (incorporating by reference § 6511(a)).

*Comm'r v. Lundy*, 516 U.S. at 239–40, 116 S.Ct. 647 (footnote omitted); *see also United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. at 8, 128 S.Ct. 1511 (determining that the language of section 6511(a) clearly states that taxpayers "must comply with the Code's refund scheme before bringing suit, including the requirement to file a timely administrative claim."). The Supreme Court in *Lundy* also noted that a timely filing was a prerequisite for the Court of Federal Claims to have jurisdiction for a refund claim. *Comm'r v. Lundy*, 516 U.S. at 240, 116 S.Ct. 647 ("Unlike the provisions governing refund suits in United States District Court or the United States Court of Federal Claims, which make timely filing of a refund claim a jurisdictional prerequisite to bringing suit, *see* 26 U.S.C. § 7422(a); *Martin v. United States*, 833 F.2d 655, 658–659 (7th Cir.1987), the restrictions governing the Tax Court's authority to award a refund of overpaid taxes incorporate only the look-back period and not the filing deadline from § 6511.").

■ In sum, Congress has provided strict statutory guidelines laying out the statute of limitations for the filing of a federal tax refund claim:

> Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been "erroneously," "illegally," or "wrongfully collected," §§ 1346(a)(1), 7422(a), may not be maintained in any court.

*United States v. Dalm*, 494 U.S. at 602, 110 S.Ct. 1361.

In the above captioned case, plaintiffs have satisfied all of the prerequisites for filing a timely tax refund claim in the United States Court of Federal Claims. For tax year 2002, their Form 1040 was filed on April 11, 2003. Plaintiffs then filed their amended 2002 tax return, Form 1040X, on April 7, 2006, which was within the statutory time period of three years after the initial filing. *See* 26 U.S.C. § 6511(a). Based on a carry back of their claimed theft loss in 2002, plaintiffs claimed additional refunds by filing amended tax returns for 1997, 1998, and 1999 on April 7, 2006. The IRS denied all the refund claims on July 31, 2008. On November 10, 2009, less than two years following denial by the IRS, plaintiffs filed their complaint in this court as required. *See* 26 U.S.C. § 6511(b)(1).

Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2011) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar, both in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also* Fed. R.Civ.P. 56(a) (2011); *Alabama v. North Carolina*, — U.S. —, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123

L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed.Cir.2010); *Consol. Coal Co. v. United States,* 615 F.3d 1378, 1380 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States,* 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States,* 553 F.3d 1375, 1378 (Fed.Cir.2009); *Casitas Mun. Water Dist. v. United States,* 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied,* 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States,* 404 F.3d 1335, 1342 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2005); *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1370–71 (Fed. Cir.), *reh'g en banc denied* (Fed.Cir.2004), *cert. denied,* 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Boensel v. United States,* 99 Fed.Cl. 607, 610–11 (2011), A fact is material if it will make a difference in the result of a case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Cohen v. United States,* 100 Fed.Cl. 461, 467 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Walker v. United States,* 79 Fed.Cl. 685, 692 (2008); *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Schlup v. Delo,* 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Boensel v. United States,* 99 Fed.Cl. at 610–11; *Macy Elevator, Inc. v. United States,* 97 Fed.Cl. 708, 717 (2011); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States,* 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (Fed.Cir. 2002), *published at* 317 F.3d 1331 (Fed.Cir. 2003); *Becho, Inc. v. United States,* 47 Fed. Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Scott v. Harris,* 550 U.S. at 380, 127 S.Ct. 1769; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir), *reh'g denied* and en banc *suggestion declined* (Fed.Cir.1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.,* 262 F.3d 1306, 1316 (Fed.Cir.2001); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir. 1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992);

*see also Metric Constr. Co., Inc. v. United States,* 73 Fed.Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Takeda Pharm. Co. v. Doll,* 561 F.3d 1372, 1375 (Fed.Cir. 2009); *Long Island Sav. Bank, FSB v. United States,* 503 F.3d 1234, 1244 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied,* 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999); *Wolfchild v. United States,* 101 Fed.Cl. 54, 61 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *see also Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *Yant v. United States,* 588 F.3d 1369, 1371 (Fed.Cir.2009), *cert. denied,* —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); *Am. Pelagic Co. v. United States,* 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.,* 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied,* 293 F.3d 1364 (Fed.Cir.2002), *cert. denied,* 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir.1998). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav.*

*Bank, F.S.B. v. United States,* 584 F.3d 1369, 1374 (Fed.Cir.2009); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States,* 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir.2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed.Cir.1995)), *reh'g denied and en banc suggestion declined* (Fed.Cir.1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Wavetronix LLC v. EIS Elec. Integrated Sys.,* 573 F.3d 1343, 1354 (Fed.Cir.2009); *Florida Power & Light Co. v. United States,* 375 F.3d 1119, 1124 (Fed.Cir.2004); *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Long Island Sav. Bank, FSB v. United States,* 503 F.3d at 1244; *Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States,* 434 F.3d 1359, 1369 (Fed.Cir.2006). "Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.

1999)) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law.").

Defendant argues that this is a straightforward case, and that, "[w]ith respect to the decline in the value of the Schroerlucke's stock, since WorldCom did not receive anything from Schroerlucke after he exercised his options, the company could not have taken or appropriated any property from Schroerlucke, the prerequisite for theft under applicable state law." The parties agree that the applicable state law is the state law of Georgia. Plaintiffs respond by pointing out that, "[t]he Internal Revenue Service has not disputed the fact that the Plaintiffs sustained a loss on their investment in World-Com." Plaintiffs claimed and were allowed the maximum annual capital loss deduction of $3,000.00 pursuant to 26 U.S.C. § 1211(b) by the IRS. *See* 26 U.S.C. § 1211(b). According to the plaintiffs, "[t]he only question was whether the loss was a theft loss or an ordinary loss." Although defendant does not dispute that plaintiffs sustained a loss on their WorldCom investment, defendant disputes whether plaintiffs could have sustained a theft loss under Georgia law. In order to prove their theft loss claim, plaintiffs have a complex view of how the case should proceed, which involves delving deeply into the extensive facts of the WorldCom fraud and subsequent bankruptcy. Plaintiffs also contest defendant's claim that WorldCom's fraudulent activities did not begin until after Mr. Schroerlucke exercised his stock options on February 12, 1999. According to plaintiffs, the WorldCom fraud actually began well before that time.

After much discussion between the court and the parties, as well as limited discovery, it became clear, however, that, prior to the in-depth discovery projected by plaintiffs, the first question for consideration should be whether Georgia law even contemplates the type of loss presented by the facts in this case as a theft. At this stage of the proceedings, on the limited issue of whether a theft could have occurred under Georgia law, there are no material facts in dispute.

In order to qualify for a theft loss on their federal return, a taxpayer must meet the conditions set out in 26 U.S.C. § 165. The relevant portions of 26 U.S.C. § 165 are:

(a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

. . . . .

(e) Theft losses.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

(f) Capital losses.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

(g) Worthless securities.—

(1) General rule.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) Security defined.—For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

26 U.S.C. § 165.

As evident from 26 U.S.C. § 165(e) and (f), theft losses and capital losses are given different treatment in the tax code.

Section 1211(b) limits capital losses as follows:

Other taxpayers.—In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of—

(1) $3,000 ($1,500 in the case of a married individual filing a separate return), or

(2) the excess of such losses over such gains.

26 U.S.C. § 1211(b). Capital loss carrybacks and carryovers are outlined in 26 U.S.C. § 1212(b), which states:

(1) In general.—If a taxpayer other than a corporation has a net capital loss for any taxable year—

(A) the excess of the net short-term capital loss over the net long-term capital gain for such year shall be a short-term capital loss in the succeeding taxable year, and

(B) the excess of the net long-term capital loss over the net short-term capital gain for such year shall be a long-term capital loss in the succeeding taxable year.

26 U.S.C. § 1212(b)(1).[7] The United States Court of Appeals for the Sixth Circuit explained in *MTS International, Inc. v. Com-*

*missioner*, 169 F.3d 1018 (6th Cir.1999), that the distinction between a capital loss and a theft loss is significant with respect to the amount of an allowable deduction:

The difference is significant, in that a capital loss is immediately deductible only against capital gains and no more than $3,000 of ordinary income in each taxable year (with the unused deduction being carried forward to later tax years), whereas a theft loss is immediately deductible in full against all taxable income.

*Id.* at 1020; *see also* 26 U.S.C. §§ 1211(b), 165(e).

Treasury Regulation §§ 1.165–1, 1.165–4, 1.165–5, and 1.165–8 further explain the statutes quoted above.[8] Under Treasury Regulation § 1.165–1(c)(3), "[a] loss from the sale or exchange of a capital asset shall be allowed as a deduction under section 165(a) but only to the extent allowed in [26 U.S.C. § ] 1211 (relating to limitation on capital losses) and [26 U.S.C. § ] 1212 (relating to capital loss carrybacks and carryovers), and in the regulations under those sections." Treas. Reg. § 1.165–1(c)(3) (2011). Furthermore, Treasury Regulation § 1.165–1(d)(3) states:

Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see [Treasury Regulation] § 1.165–8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of [26 U.S.C. § ] 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

Treas. Reg. § 1.165–1(d)(3). Treasury Regulation § 1.165–4(a) deals specifically with the decline in value of stock:

(§ 1.165–3), farming losses (§ 1.165–6), and casualty losses (§ 1.165–7). *See* Treas. Reg. §§ 1.165–2; 1.165–3; § 1.165–6; § 1.165–7 (2011). These sections are not relevant to the above captioned case.

---

7. Although 26 U.S.C. § 1212(b) was amended in 2004, the amendments do not affect the capital loss carrybacks and carryovers.

8. The intervening Treasury Regulation sections deal with obsolescence of nondepreciable property (§ 1.165–2), demolition of buildings

(a) Deduction disallowed. No deduction shall be allowed under [26 U.S.C. § ] 165(a) solely on account of a decline in the value of stock owned by the taxpayer when the decline is due to a fluctuation in the market price of the stock or to other similar cause. A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under [26 U.S.C. § ] 165(a) if the stock has any recognizable value on the date claimed as the date of loss. No loss for a decline in the value of stock owned by the taxpayer shall be allowed as a deduction under [26 U.S.C. § ] 165(a) except insofar as the loss is recognized under [Treasury Regulation] § 1.1002–1 upon the sale or exchange of the stock and except as otherwise provided in [Treasury Regulation] § 1.165–5 with respect to stock which becomes worthless during the taxable year.

Treas. Reg. § 1.165–4(a) (2011). Treasury Regulation § 1.165–5 provides the following regarding worthless securities:

(b) Ordinary loss. If any security which is not a capital asset becomes wholly worthless during the taxable year, the loss resulting therefrom may be deducted under [26 U.S.C. § ] 165(a) as an ordinary loss.

(c) Capital loss. If any security which is a capital asset becomes wholly worthless at any time during the taxable year, the loss resulting therefrom may be deducted under [26 U.S.C. § ] 165(a) but only as though it were a loss from a sale or exchange, on the last day of the taxable year, of a capital asset. See [26 U.S.C. § ] 165(g)(1). The amount so allowed as a deduction shall be subject to the limitations upon capital losses described in paragraph (c)(3) of [Treasury Regulation] § 1.165–1.

.    .    .    .    .

(f) Decline in market value. A taxpayer possessing a security to which this section relates shall not be allowed any deduction under [26 U.S.C. § ] 165(a) on account of mere market fluctuation in the value of such security. See also [Treasury Regulation] § 1.165–4.

Treas. Reg. § 1.165–5 (2011). Finally, Treasury Regulation § 1.165–8(d) broadly defines "theft" as follows: "For purposes of this section the term 'theft' shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." Treas. Reg. § 1.165–8(d) (2011), leaving the specifics to the applicable state law.

■ The burden of establishing that a deductible loss, including a theft loss, occurred lies with the plaintiffs. *See Boehm v. Comm'r*, 326 U.S. 287, 294, 66 S.Ct. 120, 90 L.Ed. 78 (1945) ("Here it was the burden of the taxpayer to establish the fact that there was a deductible loss in 1937."), *reh'g denied*, 326 U.S. 811, 66 S.Ct. 468, 90 L.Ed. 495 (1946); *Krahmer v. United States*, 810 F.2d 1145, 1147 (Fed.Cir.1987) (recognizing the difficulty to prove intent using circumstantial evidence in a theft loss deduction case, but holding that the United States Claims Court did not place too high a burden of proof on a taxpayer to establish that a deductible loss occurred); *Jeppsen v. Comm'r*, 128 F.3d 1410, 1418 (10th Cir.1997) (noting that the plaintiff bears the burden of proving entitlement to a theft loss deduction), *cert. denied*, 524 U.S. 916, 118 S.Ct. 2298, 141 L.Ed.2d 158 (1998); *Howard v. United States*, 497 F.2d 1270, 1272 n. 4 (7th Cir.1974) ("Plaintiffs, of course, had the burden of establishing that a theft occurred.").

■ While a theft conviction may establish conclusively the existence of a theft under 26 U.S.C. § 165(e), the lack of such a conviction does not necessarily preclude a theft loss deduction pursuant to 26 U.S.C. § 165(e), provided that the requisite specific intent to deprive is present. *See Vietzke v. Comm'r*, 37 T.C. 504, 510 (1961) (holding that a theft had occurred for purposes of 26 U.S.C. § 165(e), even though the alleged perpetrator of the theft was not convicted of a theft crime). Fraudulent inducements to hold a publicly traded stock while it declines in value, however, do not generally give rise to a theft loss deduction. *See Marr v. Comm'r*, No. 8017–92, T.C. Memo 1995–250, 1995 WL 350895, at *4 (T.C. June 12, 1995) ("Finally, we know of no authority for the proposition that petitioner suffered a theft loss as a result of representations by [the

Chairman of the Board of Quantech] which caused petitioner to not sell his Quantech stock."); *see also Gourley v. United States,* No. 08–558T, 2009 WL 2700206, at *5 (Fed. Cl. Aug. 26, 2009) (unpublished decision).[9]

▮ The United States Court of Appeals for the Federal Circuit, in *Palahnuk v. United States,* 475 F.3d 1380 (Fed.Cir.2007), explained that the risk of decline in value of a publicly traded stock transfers from company to employee once the employee exercises stock options.[10] The court wrote:

> Upon exercising his stock options, the purchase price of the stock was, in fact, paid to Metromedia, and Palahnuk became the beneficial (and actual) owner of the stock. Any risk of decline in the value of the shares was transferred from Metromedia to Palahnuk....

*Palahnuk v. United States,* 475 F.3d at 1383; *see also* Treas. Reg. § 1.165–1(d)(3). Moreover, the decline in value of publicly traded stock cannot normally constitute a theft because it is impossible to "estimate the specific portion of the decline attributable to the illegal activities of the corporate officers petitioner describes as 'theft,' as opposed to the decline that might be attributable to business risks, market decline, poor or derelict management, and other illegal acts clearly not comprising any of the elements of a theft." *Paine v. Comm'r,* 63 T.C. 736, 743, *aff'd without opinion,* 523 F.2d 1053 (5th Cir. 1975).

▮ In the case currently before the court, defendant argues that "a decline in the value of publicly traded stock is not a theft." Plaintiffs respond that "[d]efendant's argument that a decline in value of a publicly traded stock cannot be a theft is without merit...." Although in markedly different fact circumstances from the present case, the United States Tax Court has held that in limited fact situations, the decline in value of a publicly traded stock may be considered the subject of a theft when an investor acquires stock directly from the company as opposed to acquiring it on an open market, and specific intent to defraud can be established. *See De Fusco v. Comm'r,* 38 T.C.M. (CCH) 920, 922 (1979). In *De Fusco,* the employee (petitioner) purchased stock from his employer, some directly from the company via a stock option plan and some on the open market, which purchases, the Tax Court found, "were stimulated in large part by the glowing prospects portrayed to the salesmen at 'brainwashing' meetings in the company offices," which "constituted gross misrepresentations." *Id.* at 920. The *De Fusco* court held that a theft had occurred with respect to petitioner's stock because respondent's (the Commissioner of the Internal Revenue Service) brief indicated: "In the instant case, it appears that EFCA [Equity Funding Corporation of America] had, through its officers, *the specific intent to deprive the petitioners of their property* and did, in fact, obtain property from the petitioners by making false representations to them regarding the value of the stock." *Id.* at 922 (emphasis added). The *De Fusco* court read this statement from the IRS "as a concession that a

---

9. Defendant was the first to rely on *Gourley* in its motion for summary judgment, noting that although it is designated, "Not for Publication," it should be considered by this court due to factual similarities and because it was relied on by another court in *Gudmundsson v. United States,* 665 F.Supp.2d 227, 238 (W.D.N.Y.2009), *aff'd,* 634 F.3d 212 (2d Cir.2011). Subsequently, plaintiffs also relied on *Gourley* in their response. Although not precedential, given that it is based on the same WorldCom factual predicates, and that both parties cite to the case, the court will address the *Gourley* decision below.

10. Defendant also notes that in *Taghadoss v. Commissioner,* No. 25116–06S, 2008 WL 1884052, at *3–4 (T.C. Apr. 29, 2008), the United States Tax Court indicated that a decline in the value of WorldCom stock obtained pursuant to

an option could not be the subject of a theft loss. The court wrote: "Mere shrinkage in a stock's value does not give rise to a deduction for a loss under section 165(a) 'if the stock has any recognizable value on the date claimed as the date of the loss.'" *Taghadoss v. Comm'r,* 2008 WL 1884052, at *5 (quoting Treas. Reg. § 1.165–4(a)). The Tax Court in *Taghadoss,* however, indicated that as the decision was based on a dispute involving less than $50,000.00, it "shall not be reviewed in any other court and shall not be treated as precedent for any other case." 26 U.S.C. § 7463(b) (2006). Plaintiffs' stock holdings, although of less value than at its highest point after Mr. Schroerlucke exercised his options or during subsequent stock price fluctuations, also were not worthless at the time he sold the last portion of his holdings.

theft occurred with respect to the option stock." *Id.* Generally, criminal theft statutes require privity between perpetrator and victim in order to establish that the perpetrator has a specific intent to deprive the particular victim. *See id.; see also Vietzke v. Comm'r,* 37 T.C. at 510 (although the alleged perpetrators of the theft were not convicted of a theft, a theft loss deduction was allowed because specific intent to deprive the plaintiff of his property was established under Indiana law). In the *De Fusco* case the direct link between ECFA and the petitioners was established by the concession by the IRS. No such concession is present in the Schroerluckes' case.

Mr. Schroerlucke had full ownership and control over the stock at all times after February 12, 1999, when he exercised his employee stock options. As a long-term, senior employee of WorldCom, compared to the rest of the investing public, Mr. Schroerlucke had as much, if not more, information, with respect to WorldCom's operations, which allowed him to evaluate whether to hold or when to sell his stock. Furthermore, the allegations asserted in plaintiffs' second amended complaint do not contain charges of specific intent by WorldCom personnel to deprive Mr. Schroerlucke in particular of the value of his property.

Despite diminution in value of Mr. Schroerlucke's stock holdings, the parties also agree that Mr. Schroerlucke's stock never was worthless. The plaintiffs' case bears resemblance to *Paine v. Commissioner,* 63 T.C. 736, in which the decline in the value of stock that had not become worthless was found not to be eligible for a theft loss deduction. *See id.* at 740. On the date that Mr. Schroerlucke exercised his options, the stock was worth $13,702,333.25. In fact, on February 12, 1999, Mr. Schroerlucke paid an exercise price of $1,834,856.47, for the $13,702,333.25 valued stock he had received, which means in that transaction he actually received stock worth more than seven times the exercise price that he paid. Mr. Schroerlucke chose to hold on to most of the stock he acquired in February 1999 until he began to

sell the balance of the stock off on May 1, 2002, May 24, 2002, and September 12, 2002, for $175,189.37, $2,093.35, and $6,124.39, respectively, for a total of $183,407.11. Even though the value of the WorldCom stock may have been artificially inflated, as a publicly traded stock, it was still valued at the trading price on each of the valuation dates. *See Horwith v. Comm'r,* 71 T.C. 932, 939 (1979) (rejecting petitioner's argument that the trading price of a stock was not the fair market value because material facts which might have created a different market for the stock were not disclosed). In *Horwith v. Commissioner,* the court explicitly rejected the argument that the trading price of a stock was not its fair market value:

> What petitioner's position would require us to hold, therefore, is that a universally accepted market price, the result of numerous transactions in which the general public freely participated, should be disregarded because more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed. This does not prove that the market did not exist or that the sales did not take place. Nor does it show that they did not fairly evaluate petitioner's stock at the time.

*Id.* at 938–39.

As noted above, the parties agree that the determination of what may be claimed as a theft loss pursuant to 26 U.S.C. § 165 depends upon whether the plaintiffs' claim constitutes a theft under the law of the state where the theft occurred, *see* Rev. Rul. 77–17, 1977–1 C.B. 44 (1977), in this case the State of Georgia. The parties acknowledge, however, that no case in support of the state law test has been identified in the United States Supreme Court or the United States Court of Appeals for the Federal Circuit. There is, however, clear federal, Fifth Circuit precedent, *Edwards v. Bromberg,* 232 F.2d 107, 111 (5th Cir.1956) (holding that the definition of "theft" under 26 U.S.C. § 165 depends on the law of the jurisdiction where the theft occurred); [11] as well as several deci-

---

11. Revenue Ruling 77–17 acknowledged the state law test articulated in *Edwards v. Bromberg* and

noted that the Fifth Circuit had "stated that whether a loss from theft occurred depends upon

sions by other federal courts of appeals affirming cases which raise the issue, *see, e.g., Bellis v. Comm'r*, 540 F.2d 448 (9th Cir.1976) and *Howard v. United States*, 497 F.2d 1270, and numerous United States Tax Court decisions, over a considerable period of time, which have adopted the state law test. *See, e.g., De Fusco v. Comm'r*, 38 T.C.M. at 922 ("The question whether a 'theft' occurred is, of course, determined by the law of the state where the loss was sustained."); *see also Paine v. Comm'r*, 63 T.C. at 740; *Hope v. Comm'r*, 55 T.C. 1020, 1033–34 (1971) (applying Pennsylvania law to determine whether a theft occurred for the purposes of a theft loss deduction) (citing *Edwards v. Bromberg*, 232 F.2d at 111), *aff'd*, 471 F.2d 738 (3d Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 126, 55, 38 L.Ed.2d 57 (1973); *Herrington v. Comm'r*, No. 12204–04, 2011 WL 1235720, at *4 (T.C. Mar. 30, 2011) ("Generally, whether a theft loss has been sustained depends upon the law of the State where the loss was sustained."). At all times relevant to the above captioned case, the plaintiffs were residents of the State of Georgia.

The parties further agree that there are four potentially relevant Georgia theft statutes in this case: Official Code of Georgia Annotated (OCGA) § 16–8–2 (West 2011) (theft by taking); OCGA § 16–8–3 (West 2011) (theft by deception); OCGA § 16–8–4 (West 2011) (theft by conversion); and OCGA § 16–8–5 (West 2011) (theft of services).[12] The Georgia Code, defines a "crime" as follows:

(a) A "crime" is a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence.

(b) Criminal negligence is an act or failure to act which demonstrates a willful, wan-

ton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby.

Ga.Code Ann. § 16–2–1 (West 2011). Each element of a criminal offense must be established before a person can be convicted of a crime under Georgia law. *See Martin v. State*, 96 Ga.App. 557, 100 S.E.2d 645, 647 (1957); *see also State v. Howell*, 194 Ga.App. 594, 391 S.E.2d 415, 416, *reh'g denied* (Ga.Ct. App.1990). Specific intent to commit a crime is central to the commission of a crime, and there must be established " 'facts that are not only consistent with the hypothesis of the guilt of the accused, but the facts proved must exclude every other reasonable hypothesis.' " *Jackson v. State*, 301 Ga.App. 406, 687 S.E.2d 666, 670 (2009) (quoting *Williamson v. State*, 191 Ga.App. 388, 381 S.E.2d 766, 767 (1989)).

Under Georgia law, possible criminal liability of corporations is defined as follows:

(a) A corporation may be prosecuted for the act or omission constituting a crime only if:

(1) The crime is defined by a statute which clearly indicates a legislative purpose to impose liability on a corporation, and an agent of the corporation performs the conduct which is an element of the crime while acting within the scope of his office or employment and in [sic] behalf of the corporation; or

(2) The commission of the crime is authorized, requested, commanded, performed, or recklessly tolerated by the board of directors or by a managerial official who is acting within the scope of his employment in [sic] behalf of the corporation.

---

the law of the jurisdiction where it was sustained...." Rev. Rul. 77–17, 1977–1 C.B. 44.

**12.** In the second amended complaint (and each of the prior complaints), plaintiffs only allege theft by taking (OCGA § 16–8–2), and theft by deception (OCGA § 16–8–3). In the joint statement of issues of law submitted to the court, the parties, however, agreed that theft by conversion (OCGA § 16–8–4) and theft of services (OCGA § 16–8–5) were potentially relevant to the issue of "whether the facts of this case establish that a theft occurred under any of the following Geor-

gia statutes...." Subsequently, the parties addressed theft by conversion and theft of services in motion practice. Defendant noted in its reply brief that theft by conversion and theft of services "clearly do not apply to this case...." At oral argument, plaintiffs' counsel did not argue theft of services as a relevant issue. Because theft by conversion and theft of services have been briefed by both parties as potentially relevant, the court briefly will address these two additional statutory provisions below.

(b) For the purposes of this Code section, the term:

    (1) "Agent" means any director, officer, servant, employee, or other person who is authorized to act in [sic] behalf of the corporation.

    (2) "Managerial official" means an officer of the corporation or any other agent who has a position of comparable authority for the formulation of corporate policy or the supervision of subordinate employees.

Ga.Code Ann. § 16–2–22 (West 2011). The applicable Georgia theft statutes do not contain language which "clearly indicates a legislative purpose to impose liability on a corporation," OCGA § 16–2–22(a)(1). Therefore, a corporation can only be criminally liable for theft in Georgia pursuant to OCGA § 16–2–22(a)(2). *See Davis v. State,* 225 Ga.App. 564, 484 S.E.2d 284, 287–88, *reconsideration denied* (Ga.Ct.App.), *cert. denied* (Ga.1997).

Plaintiffs allege that WorldCom committed a theft by taking under Georgia law of Mr. Schroerlucke's WorldCom investments under Georgia law, either by "concealing its fraudulent scheme" to artificially inflate the price of WorldCom stock or by "changing the business in which he invested from a lawful enterprise to an unlawful one." According to plaintiffs, if WorldCom executives' fraudulent activity predated Mr. Schroerlucke's stock option exercise on February 12, 1999, then the theft engaged in was a taking, whereas, if the fraudulent activity postdated his stock option exercise, the theft engaged in was an appropriation. By contrast, defendant argues that a theft by taking could not have occurred in this case because WorldCom did not unlawfully take any property from Mr. Schroerlucke and WorldCom executives did not have a specific intent to deprive Mr. Schroerlucke of his property.

Under Georgia law, a theft by taking occurs when one "unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." Ga.Code Ann. § 16–8–2; *see also Spray v. State,* 223 Ga.App. 154, 476 S.E.2d 878, 880–81 (1996) (affirming a conviction for theft by taking when the Chief of Police misappropriated law enforcement items for personal use), *cert. denied* (Ga.1997). The crime of "theft by taking" under Georgia law can occur in one of two ways: either taking the property of another with intent to deprive, or appropriating the property of another, which the perpetrator was initially, legally holding. The distinction between taking and appropriating depends on the timing of the intent to deprive, regardless of the manner in which the offense was committed. If the intent arose at the time the property was taken, it is a taking, whereas if the intent arose at a later time, after the property was lawfully in the accused's possession, it is an appropriation. *See Spray v. State,* 476 S.E.2d at 880.

The term "property" is defined in the Georgia Code as "anything of value, including but not limited to real estate, tangible and intangible personal property, contract rights, services, choses in action, and other interests in or claims to wealth, admission or transportation tickets, captured or domestic animals, food and drink, and electric or other power." Ga.Code Ann. § 16–1–3(13) (West 2011). The term, "property of another," as defined in the George Code, includes: "property in which any person other than the accused has an interest but does not include property belonging to the spouse of an accused or to them jointly." Ga.Code Ann. § 16–8–1 (West 2011). The term "deprive" is defined in the Georgia Code as "without justification: (A) To withhold property of another permanently or temporarily; or (B) To dispose of the property so as to make it unlikely that the owner will recover it." *Id.* The phrase in the statute, "regardless of the manner in which the property is taken or appropriated," Ga.Code Ann. § 16–8–2, "is a catch-all phrase rendering our theft by taking statute broad enough to encompass theft by conversion, theft by deception or any other of the 'myriad and even yet-to-be-concocted schemes for depriving people of their property.'" *Spray v. State,* 476 S.E.2d at 880 (quoting *Gordon v. State,* 181 Ga.App. 391, 352 S.E.2d 582 (1986), *rev'd on other grounds,* 257 Ga. 335, 359 S.E.2d 634 (1987)); *see also State v. Meeks,* 309 Ga.App. 855, 711

S.E.2d 403, 408 (2011) (noting the "elasticity in the theft by taking statute" which allows the state to indict someone for theft by taking, but prove theft by deception).

In the plaintiffs' case, a theft by taking could not have occurred because WorldCom did not unlawfully take or appropriate any property from Mr. Schroerlucke and there is no evidence in the record that there was an intention by WorldCom and/or its executives to deprive Mr. Schroerlucke specifically of the property at issue. When Mr. Schroerlucke exercised his stock options on February 12, 1999, he received the full market value and full control of all the shares owed to him under his stock option agreements. After the options were exercised, the only property transferred between the parties was from Mr. Schroerlucke to WorldCom, namely, the $1,834,856.47 exercise amount due the company, as specified in the stock option agreements in exchange for the stock delivered to Mr. Schroerlucke. Therefore, there was no unlawful taking of any of plaintiffs' property, as Mr. Schroerlucke had received the full market value of his shares at the time he exercised his options. Once the stock options were delivered to Mr. Schroerlucke, WorldCom no longer was in control of the transferred stock property, which was now completely in Mr. Schroerlucke's possession and control, and remained within his exclusive control until he decided to sell the stock he owned on a number of different occasions.

Plaintiffs allege in the second amended complaint that WorldCom made "material misrepresentations and omissions with the intent to deprive Plaintiffs' of their property." Although the WorldCom stock, which was in plaintiffs' control after Mr. Schroerlucke exercised his options, subsequently declined in value, there is no evidence in the record that the WorldCom executives had any specific intent with regard to Mr. Schroerlucke to take or appropriate his stock by devaluation, or by any other means.[13] To

the contrary, the goal of WorldCom, including the convicted executives, was to increase the value of the stock, including any stock owned and controlled by Mr. Schroerlucke. There is no evidence in the record of any specific intent by WorldCom executives to deprive Mr. Schroerlucke of his property, as required to prove theft under the Georgia theft statutes. When asked at oral argument to identify specific examples of intent to deprive Mr. Schroerlucke, plaintiffs' counsel repeated general statements, such as "WorldCom concealed from Mr. Schroerlucke the fraud that it was perpetrating over the years," "Mr. Schroerlucke had discussions and communications with people at WorldCom, and with Mr. Ebbers, et cetera, where [sic] they indicated to him that the company was doing well." Moreover, despite plaintiffs' counsel's further contention at oral argument that plaintiffs' response "addresses in tremendous detail all of the points that the government raises," plaintiffs' written submissions to the court are similarly general in nature and fail to demonstrate any specific intent by WorldCom executives to deprive Mr. Schroerlucke of any of his property. The general allegations in the second amended complaint, and the statements included in the record before the court, that WorldCom, through its executives, acted with intent to deprive Mr. Schroerlucke of his property, are insufficient to survive the summary judgment standard. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Republic Sav. Bank, F.S.B. v. United States,* 584 F.3d at 1374.

Despite the lack of evidentiary support, in an attempt to establish the intent to deprive plaintiffs argue that because Mr. Schroerlucke acquired his stock directly from WorldCom, as opposed to the open market, this "provides the privity necessary to illustrate that the principals intended to deprive the shareholder of his money or property through their fraudulent activities." Plaintiffs state, "stock acquired directly from the

---

**13.** Moreover, the United States Supreme Court recently indicated in *Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011), in the context of a private securities fraud action, "the fact that a stock's 'price on the date of purchase was inflated be-

cause of [a] misrepresentation' does not necessarily mean that the misstatement is the cause of a later decline in value." *Id.* at 2186 (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

corporation, rather than on the open public trading market, establishes privity such that fraudulent activity of the corporation's principals upon the purchaser of that stock evidences the specific intent to deprive the shareholder of his money or property." Defendant responds that "[t]he mere existence of some relationship between a corporate executive who commits accounting fraud and a shareholder, regardless of how tenuous that relationship might be, does not establish a theft unless it is established that the executive committed the fraud with the intent to deprive that shareholder of his or her property." Although the question of whether privity exists between WorldCom and Mr. Schroerlucke remains unresolved in this case,[14] plaintiffs' argument that WorldCom intended to deprive Mr. Schroerlucke of his property is without merit, even assuming that plaintiffs could establish privity between WorldCom and Mr. Schroerlucke. Plaintiffs' argument seeks to establish the converse of the court's holding in *De Fusco v. Commissioner*, 38 T.C.M. at 922. In *De Fusco*, the lack of privity was found to be fatal to petitioner's case because he was unable to establish the requisite specific intent to deprive in the absence of a relationship between himself and the alleged defrauder. *Id.* This holding has a logical underpinning: one cannot be said to have specific intent to deprive another with whom one has no particular relationship. However, the converse is not necessarily true. Just because one person may be in privity with the one alleged to have been defrauded does not automatically establish the requisite intent to deprive that person. Therefore, even assuming that Mr. Schroerlucke was in privity with WorldCom or its executives, plaintiffs also must show that WorldCom and/or its executives acted with specific intent to deprive Mr. Schroerlucke of his property in order to establish a theft by taking under Georgia law. From the evidence in the record before the court, plaintiffs have not demonstrated specific intent, and privity alone is insufficient to prove their case.

Plaintiffs also argue that WorldCom engaged in a theft by taking because Mr. Schroerlucke possessed the right to have stock ownership in what plaintiffs term a "lawful and legitimate business enterprise," which plaintiffs allege was not the case, due to what plaintiffs label the WorldCom "massive financial frauds." The shares received by Mr. Schroerlucke on February 12, 1999, however, were those of a "lawful and legitimate business enterprise." The fact that certain employees of a corporation may have engaged in impermissible conduct while Mr. Schroerlucke was employed by the company, or after his stock vested and he assumed ownership of his stock, does not render an otherwise legitimate corporation unlawful or illegitimate.

Mr. Schroerlucke became the owner of his stock, at the latest, on February 12, 1999, when he exercised his stock options, after which he had ownership and control of his stock and received unilateral authority to hold or to sell the stock. On February 12, 1999, Mr. Schroerlucke received all that he was entitled to from WorldCom pursuant to the stock option agreements, 172,492 shares in WorldCom stock, with a market value at the time of $13,702,333.25. From that point forward, those shares were in his exclusive and total control. He had the opportunity to hold them or sell them, for instance on February 16, 1999, at the time the share price had risen to $83.00 per share from $79.4375 per share. The fact that Mr. Schroerlucke chose not to sell, but, rather, opted to hold onto the shares until a later date, and sell at a time when the market value had declined significantly, does not transform the fallen stock price and corresponding loss of value into a theft by taking. Once plaintiffs had ownership of the stock, no one, including WorldCom executives or employees, could compel Mr. Schroerlucke, an individual stockholder, to sell or not sell, his stock in the publicly traded company at any particular time. Moreover, later disclosure of fraudulent activity by WorldCom could not cause a retroactive reevaluation of publicly traded stock for tax purposes.

---

**14.** Defendant acknowledges that there are disputes of material fact regarding whether there was privity between Mr. Schroerlucke and WorldCom.

Nor could public general announcements and statements, or even general, private conversations of the type described in the record, qualify plaintiffs for a theft loss under Georgia law. No one but Mr. Schroerlucke was ultimately responsible for monitoring the value of the stock and for managing his stock portfolio. Like any other shareholder, Mr. Schroerlucke possessed the free will to sell, or not to sell, his stock at any time once he had control. In fact, Mr. Schroerlucke made a profit on the shares he sold initially after he exercised his options on February 12, 1999. The price per share of WorldCom stock after he exercised his stock options was $79.4375, and had risen to $80.67 per share when he sold a portion of his WorldCom stock holdings. As of February 28, 1999, the market value of Mr. Schroerlucke's World-Com stock had risen from $7,714,811.12 to $8,012,235.00. Mr. Schroerlucke watched rises and declines in the value of the stock before finally deciding to sell the remainder of his WorldCom stock holdings.

■ Plaintiffs also allege that WorldCom committed a theft by deception of plaintiffs' property by "defraud[ing] the Plaintiffs into exercising their options, investing in the Company, and holding that investment by concealing material facts of a vast existing fraudulent scheme." In defendant's motion for summary judgment, defendant argues that "the statements Schroerlucke identified in his discovery responses as having been made to him were not false so there could be no theft by deception," and even if they were false, "there can be no theft by deception in this case because WorldCom did not obtain any property of Schroerlucke, with an intent to deprive Schroerlucke of that property."

■ Under Georgia law, a theft by deception occurs when one "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." Ga.Code Ann. § 16–8–3(a). The statute defines deception as follows:

(b) A person deceives if he intentionally:

(1) Creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false;

(2) Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed;

(3) Prevents another from acquiring information pertinent to the disposition of the property involved;

(4) Sells or otherwise transfers or encumbers property intentionally failing to disclose a substantial and valid known lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not a matter of official record; or

(5) Promises performance of services which he does not intend to perform or knows will not be performed. Evidence of failure to perform standing alone shall not be sufficient to authorize a conviction under this subsection.

(c) "Deceitful means" and "artful practice" do not, however, include falsity as to matters having no pecuniary significance, or exaggeration by statements unlikely to deceive ordinary persons in the group addressed.

Ga.Code Ann. § 16–8–3(b)–(c). Under OCGA § 16–8–3, the perpetrator must obtain the owner's property with intent to deprive by creating a false impression as to existing or past facts or events. *See Robinson v. State*, 198 Ga.App. 431, 401 S.E.2d 621, 622–23 (1991) (quoting *Croy v. State*, 133 Ga.App. 244, 211 S.E.2d 183, 185 (1974)) (holding that "a conviction under OCGA § 16–8–3(b)(1) is authorized only when there is a deceitful misrepresentation regarding 'an existing fact or past event,' and a false promise of future performance cannot be the basis for a conviction.").

■ A theft by deception, therefore, cannot be based on a promise of future performance, even if that promise is false or fraudulent. *See Ellerbee v. State*, 256 Ga. App. 848, 569 S.E.2d 902, 906 ("The element of a false representation must bear on an existing fact or past event and not future performance."), *reconsideration denied* (Ga. Ct.App.2002); *Robinson v. State*, 401 S.E.2d at 623 (holding that a false promise of future performance cannot be grounds for theft by deception because such loss derives not from deceitful practice, but from absolute confi-

dence in the party making the promise); *see also Croy v. State*, 211 S.E.2d at 185. The fact that a misrepresentation constitutes fraud is not sufficient to establish theft by deception. *See Willis v. First Data POS, Inc.*, 245 Ga.App. 121, 536 S.E.2d 198, 201–02 (2000) ("Theft by deception and civil fraud have different elements and are not necessarily proved by the same evidence."), *rev'd on other grounds*, 273 Ga. 792, 546 S.E.2d 781 (2001). Theft by deception, however, does not require proof of pecuniary loss and can occur when a person provides, implicitly or explicitly, knowingly false information to another. *See Jones v. State*, 285 Ga.App. 822, 648 S.E.2d 133, 136 (2007) (stating that, "[d]eception, in turn, involves providing, either implicitly or explicitly, knowingly false information to another" in relation to theft of services); *Bishop v. State,* 223 Ga.App. 285, 477 S.E.2d 422, 425 (1996) ("However, there exists no requirement of proof of pecuniary loss under the provisions of OCGA § 16–8–3 to sustain a conviction for theft by deception.").

In the above captioned case, theft by deception could not have occurred because the record does not contain evidence of knowingly false statements made to Mr. Schroerlucke with regard to past or existing events, or of a specific intent by WorldCom to deprive Mr. Schroerlucke of his property. As noted above, plaintiffs cite only to general statements, mostly made at unspecified times, predicting continued future performance by WorldCom. The decline in value of World-Com stock between 2000 and 2002, after Mr. Schroerlucke exercised his options, also cannot establish theft by deception because WorldCom did not obtain the difference in the value resulting from the decline in the value of the stock, which is a necessary element of theft by deception. *See Robinson v. State*, 401 S.E.2d at 622–23 (in which a Georgia conviction for theft by deception was reversed because there was no evidence that the defendant had obtained the funds at issue). Similarly, in plaintiffs' case, there is no evidence that WorldCom, or its executives, obtained any portion of the amount of decline in value of Mr. Schroerlucke's WorldCom stock between 2000 and 2002. As in *Ellerbee v. State*, 256 Ga.App. 848, 569 S.E.2d 902, in which a promise of future payment did not satisfy the false representation element of theft by deception, *id.* at 906, the representations by WorldCom executives, that those who chose to immediately exercise and sell their stock options would "give up future potential stock price appreciation," is at best speculation and hope of future performance, which cannot form the basis of theft by deception because it does not "bear on an existing fact or past event. . . ." *Id.* There is nothing remarkable about the statements attributable to WorldCom executives cited by plaintiffs. It goes without saying that those who sell a publicly traded stock will hope for and predict future potential stock price appreciation. The general, self-promotional and public relations-type statements cited by the plaintiffs, such as the "company was doing well" and that the business is run in an "ethical and honest fashion," are not sufficient to establish theft by deception in a situation in which Mr. Schroerlucke had full control of his stock, was free to do his own research and exercise his own decision-making power on when to sell his stock.

As noted above, plaintiffs cite to the unpublished Court of Federal Claims decision in *Gourley v. United States*, 2009 WL 2700206, a case also derived from the WorldCom factual history, in an attempt to bolster their argument that a deception occurred with respect to Mr. Schroerlucke's decision to "Exercise and Hold" his WorldCom stock. Plaintiffs rely on a footnote in the *Gourley* case. The footnote states:

> It is more likely that it was Mr. Gourley's choice to "exercise and hold" that was affected by WorldCom's alleged misrepresentations rather than his decision to exercise the options at all. Given the Court's construction of the applicable law, however, it is unnecessary for the Court to resolve the factual issue of Mr. Gourley's motivation for exercising the options.

*Id.* at *5 n. 4 (citations omitted). The case and cited footnote, however, do not support the plaintiffs. In fact, the *Gourley* court also wrote: "Plaintiffs are not the first, nor will they be the last, purchasers of stock who later discover that they have received less than they hoped. But they possessed the

same information that was available to the public when they bought this publicly traded stock and both they and the public knew what the stock sold for on that date." *Id.* at *5. Not only is the *Gourley* case an unpublished and non-precedential decision, but the court in *Gourley* explicitly declined to make factual findings related to Mr. Gourley's decision not to sell his stock, *id.* at *5 n. 4, and offered only general speculation. Moreover, plaintiffs' argument that Mr. Schroerlucke was a victim of theft by deception related to his decision to "hold" his WorldCom stock until it declined in value confuses the issue. "Exercise and Hold," as used in *Gourley*, refers to one of the three options available to WorldCom employees upon exercising their options. It does not refer to a particular investor's decision as to whether or not to sell his stock at some later date. In fact, it does not even appear that Mr. Schroerlucke chose the "Exercise and Hold" option. Instead, the record suggests, that, at least once, he chose to "Exercise and Sell to Cover," as evidenced by his sale of 75,374 shares of the WorldCom stock he received through his option exercise in order to pay the exercise price and withholding taxes due.

Mr. Schroerlucke did not sell the balance of his WorldCom stock until May and September of 2002, after the value of his stock holdings had significantly declined from the original $79.4375 per share, when he exercised his options on February 12, 1999, to $0.91 per share on June 24, 2002, just prior to the suspension of trading on WorldCom stock. As in *Palahnuk v. United States*, 475 F.3d 1380, in which the plaintiff taxpayer bore the risk of decline in value of stock once he exercised his options, *id.* at 1383, Mr. Schroerlucke bore the risk of decline in the value of his WorldCom stock once he exercised his options on February 12, 1999. Even if statements by WorldCom executives caused Mr. Schroerlucke to hold his World-Com stock, he is not entitled to a theft loss deduction under Georgia law.

■ Although theft by conversion was not alleged in the second amended complaint,

plaintiffs argue in their brief that WorldCom used money transferred from Mr. Schroerlucke in subsequent operations of the corporation's business, "contrary to the law and contrary to its contractual and fiduciary obligations to its shareholders," which "constitutes theft by conversion under Georgia law." Defendant argues that "[t]here clearly was no theft by conversion in this case because Schroerlucke never provided any funds to WorldCom with specific directions that the money be applied to a specific purpose."

■ Under Georgia law, the relevant portion of the theft by conversion statute states:

A person commits the offense of theft by conversion when, having lawfully obtained funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation. This Code section applies whether the application or disposition is to be made from the funds or property of another or from the accused's own funds or property in equivalent amount when the agreement contemplates that the accused may deal with the funds or property of another as his own.

Ga.Code Ann. § 16–8–4(a), *held unconstitutional in part by Sherrod v. State*, 280 Ga. 275, 627 S.E.2d 36, 38 (2006) (holding that the mandatory presumption contained in OCGA § 16–8–4 was unconstitutional as applied to conversion of leased property);[15] *see also Hartsell v. State*, 288 Ga.App. 552, 654 S.E.2d 662, 665 (2007) (holding that "his own use" in OCGA § 16–8–4(a) refers to using the funds for a chosen use other than the purpose specified in the agreement); *Myrick v. State*, 210 Ga.App. 393, 436 S.E.2d 100, 101 (1993) (reversing a conviction for theft by conversion when the accused was given money with no specific direction as to how to use that money). Therefore, when an agreement calls only for a transfer of funds for general

**15.** As of the date of this opinion, OCGA § 16–8–4 remains unchanged, although portions of the

statute were held unconstitutional.

as opposed to specific application, there can be no theft by conversion even if the recipient converts those funds to his own use. *See Hill v. State*, 198 Ga.App. 1, 401 S.E.2d 48, 49–50 (1990) ("However, one who merely obtains funds as the present consideration for his promise to perform future services is under no agreement or other known legal obligation to make a specified application of *those specific funds*, but is only under the contractual obligation to provide *the promised services* and may *not*, therefore, be found criminally liable for theft by conversion of the funds under OCGA § 16–8–4.") (emphasis in original).

In plaintiffs' case, there was no theft by conversion, nor could there have been, because Mr. Schroerlucke did not provide any funds to WorldCom with directions that the funds be used for any specific application. Mr. Schroerlucke paid the exercise price for his employee stock options, as specified by the terms of the stock option agreements, and received the full market value of the stock options he was entitled to at the time, in accordance with the agreements. In *Hill v. State*, 401 S.E.2d 48, no theft by conversion was found when a seller of property gave no specific directions as to how a $2,500.00 fee was to be applied by the defendant. *Id.* at 49–50. Similarly, in this case, the stock was transferred to Mr. Schroerlucke, but none of the employee stock option agreements provided specific direction as to how the exercise price paid to the company, in exchange for transferring the stock ownership, would be used by WorldCom. Therefore, the second element, an agreement to make specific use of funds, of the Georgia theft by conversion, statute, § 16–8–4(a), cannot be met in this case, and there was no theft by conversion.

■ Finally, although also not alleged in the second amended complaint, plaintiffs raise the possibility that WorldCom engaged in theft of services with respect to Mr. Schroerlucke's employment at WorldCom. Although plaintiffs "do not allege that the WorldCom deception occurred throughout Mr. Schroerlucke's entire employment" with WorldCom, they argue that "consideration of [the theft of services] statute does put the issue into proper focus." Plaintiffs, however, do not explain their basis or offer evidence to support their argument that theft of services occurred in this case. Defendant responds that there cannot have been a theft of services with respect to Mr. Schroerlucke because at the time he left the company, he received all the compensation and value to which he was entitled from WorldCom.

Under Georgia law, "[a] person commits the offense of theft of services when by deception and with the intent to avoid payment he knowingly obtains services, accommodations, entertainment, or the use of personal property which is available only for compensation." Ga.Code Ann. § 16–8–5. The primary thrust of the offense is the intention to avoid payment. *See Johnson v. State*, 159 Ga.App. 497, 283 S.E.2d 711, 712 (1981) (citing *Roberson v. State*, 145 Ga.App. 687, 244 S.E.2d 629, 630 (1978)).

In the above captioned case, there was no theft of services because there is no evidence that WorldCom knowingly obtained services from Mr. Schroerlucke with intent to avoid payment. There is no allegation in the second amended complaint, or in other filings by plaintiffs, that Mr. Schroerlucke was not compensated, or not compensated fully, while working for WorldCom. Mr. Schroerlucke received all the stock options to which he was entitled when he left the company: 172,492 shares of WorldCom stock options exercised on February 12, 1999 at full market value. Although plaintiffs argue, "[t]he options were granted as compensation for [Mr. Schroerlucke's] services, and were not some windfall or discretionary gift to which he had no entitlement[,]" there is no evidence from the record in the above captioned case that WorldCom obtained services from Mr. Schroerlucke, even if part of his compensation package was stock options, with the intent to avoid compensation. *See Johnson v. State*, 283 S.E.2d at 712 (holding there was insufficient evidence that the accused intended to obtain use of equipment without paying for it); *see also Jackson v. State*, 301 Ga.App. 406, 687 S.E.2d 666, 670 (2009) (quoting *Roberson v. State*, 244 S.E.2d at 630 (" 'The essential ingredient of the offense [theft of

services] is the intention to avoid payment.'")).

## CONCLUSION

After a review of the record and the applicable law, the court concludes that for the reasons discussed above, plaintiffs do not qualify for a theft loss for their 1997, 1998, 1999, and 2002 tax years. Nothing was taken or appropriated. Nor was there theft by deception, theft by conversion, or theft of services. Although entitled to capital loss deductions, plaintiffs are not entitled to a theft loss deductions under 26 U.S.C. § 165.[16] For the foregoing reasons, defendant's motion for summary judgment is **GRANTED.** Plaintiffs' complaint is **DISMISSED,** with prejudice. The Clerk of the Court shall enter **JUDGMENT** consistent with his opinion.

**IT IS SO ORDERED.**

---

**16.** Even if plaintiffs had been able to establish that a theft occurred under the applicable Georgia theft statutes, plaintiffs would still face a monumental task to establish whether there is a "reasonable prospect of recovery" of their reported theft loss, and if so, to ascertain with reasonable certainty the amount they would receive upon resolution of a reimbursement claim. *See* Treas. Reg. § 1.165–1(d)(3); *see also Palahnuk v. United States,* 475 F.3d at 1383.